

FILED

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(ALEXANDRIA DIVISION)

| | |
|---|---|
| ANIMATORS AT LAW, INC., a Virginia corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CAPITAL LEGAL SOLUTIONS, LLC, a Virginia limited liability company; APRIL TATE TISHLER, an individual; WILLIAM YARNOFF, an individual,<br><br>Defendants. | COMPLAINT FOR: 1:10CV1341 TSE/TCB<br><br>1. BREACH OF CONTRACT;<br>2. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS;<br>3. MISAPPROPRIATION OF TRADE SECRETS;<br>4. UNFAIR COMPETITION;<br>5. THEFT/CONVERSION;<br>6. BREACH OF FIDUCIARY DUTY;<br>7. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;<br>8. UNJUST ENRICHMENT; and<br>9. VIOLATION OF COMPUTER FRAUD & ABUSE ACT<br><br>DEMAND FOR JURY TRIAL |

Animators at Law, Inc. ("Plaintiff" or "Animators") by and through its counsel of record, files this Complaint against Defendants Capital Legal Solutions, LLC ("CLS"), April Tate Tishler ("Tishler") and William Yarnoff ("Yarnoff" and collectively "Defendants") and alleges as follows:

## PRELIMINARY STATEMENT

1.      Animators was founded in 1995 and is a nationally recognized full-service litigation support firm providing litigation consulting, graphics and technology support, primarily to major law firms worldwide.   In fifteen years Animators has consulted on

thousands of cases with trillions of dollars cumulatively at stake for over 90% of the top ranked U.S. law firms, many Fortune 500 corporations and government agencies.

2.      CLS, according to its marketing literature, has provided "technology services to the legal community since 2002.  Our clients are law firms, corporations and government agencies involved in complex litigation, regulatory matters and investigations.  We assist them with efficient, cost-effective solutions to the challenge of managing electronically stored information."  (*See* "About Us" tab at www.capitallegals.com).

3.      Until early 2010, Animators and CLS were not competitors.  Animators had used CLS as a vendor on certain projects where, for example, Animators had been retained to provide traditional litigation support services (*e.g.*, demonstrative exhibits for trials) but where electronic discovery ("e-discovery") services were also needed.  In such instances, CLS would provide these e-discovery services at the direction of Animators.

4.      In early 2010, CLS began colluding with two of Animators' key employees, Tishler and Yarnoff, to steal Animators' business.  Defendants' plan succeeded.  After misappropriating highly confidential information about virtually all of Animators' current projects and projects "in the pipeline", Tishler and Yarnoff abruptly resigned from Animators and immediately joined CLS along with several other Animators employees.  Within a few weeks of this defection, CLS not coincidentally announced the creation of a new division, "CLS Trial Consulting".  CLS' press release is particularly telling:

> "Capital Legal Solutions...announces the launch of CLS Trial Consulting, a new division offering consulting and support services to AmLaw 100 firms and Fortune 1000 companies involved in high stakes litigation...<u>CLS Trial Consulting provides recommendations for visual strategies through all stages of litigation - creating compelling presentations and animation, delivering graphics and other evidence in court by seasoned trial technicians, and testing of graphics for jury exercises.</u>

> Leading the new division are April Tate Tishler, Vice President of
> CLS Trial Consulting, and Bill Yarnoff, Vice President of
> Business Development.  April Tishler worked for a number of
> years as a senior trial consultant in the litigation support industry.
> Prior to embarking on her career in litigation support, April was a
> litigator in the intellectual property group at Jones Day in New
> York and Washington, DC, specializing in patent, trademark, and
> commercial matters.
>
> Bill Yarnoff has nearly twenty years of experience in business
> development and marketing for leading global technology,
> consulting, and litigation support companies.  In his new role, Mr.
> Yarnoff is responsible for building and leading CLS's global sales
> activities with a strategic focus on new client acquisition and
> expansion of litigation support offerings.
>
> Adding this new division to its portfolio is in line with CLS's
> strategy to offer a full spectrum of litigation services.  President
> and CTO of CLS, Dharmesh Shingala, said, "End-to-end litigation
> support means increasing efficiencies with seamless transitions at
> each phase of litigation, eliminating the need to send the same data
> to different vendors...."

(*See* April 1, 2010 press release, "News" tab at www.capitallegals.com, emphasis added).

     5.     Not only have Defendants stolen existing and future Animators business, but

CLS Trial Consulting's brand is virtually identical to Animators' brand.  Having successfully

stolen Animators' existing and future business and key employees, CLS did not even bother

creating its own identity, deciding instead to illegally appropriate Animators' brand.

Following are just a few examples:

| ANIMATORS | CLS[1] |
|---|---|
| "…utilizing our team of **seasoned trial technicians** who will ensure the **seamless presentation** of exhibits, deposition testimony, documents, and presentations of all types." | "CLS Trial Consulting offers…the **seamless delivery** of graphics and other evidence in court by our **seasoned trial technicians**." |
| "**As an attorney owned and operated firm, Animators' consultants are former litigators** themselves, each of whom works closely with the trial team to develop the **most effective and compelling** trial presentations and graphics available." | "**Because our consultants are lawyers and former litigators**…they are skilled in developing visual strategies for cases and crafting the **most effective and compelling** ways of translating complex legal concepts into high-impact visuals." |
| "Animators' **trial technicians** support trials all **around the country**. These individuals have been selected for their **skill and their experience sitting in the "hot seat"**…and **flawless presentation of documents**, audio/video media, and **graphics-based demonstratives.**" | "Our **trial technician**s consistently demonstrate **their skills in the hot seat**, delivering effective data management and the **flawless presentation of documents**, audio/video media, and **graphics-based demonstratives** in courtrooms **around the country**." |
| "**Animators at Law provides jury research services in concert with our strategic alliance partners that specialize in these areas.**" | "And through **strategic alliance partners, we offer our clients the full spectrum of jury services**." |

---

[1] All of the language in the "CLS" section of this chart comes from the "CLS Trial Consulting" tab at CLS' website, www.capitallegals.com. A true and correct copy of the relevant portion of this website is attached hereto as Exhibit "1".

All of the language in the "Animators" section of this chart comes from the Animators' website or from proposals that Animators submitted to clients or potential clients.

| | |
|---|---|
| "Animators' litigation consulting team will **seamlessly integrate with the…trial team** to support your efforts each step of the way." | "We **seamlessly integrate with your trial team.**" |
| "We will work with you throughout to design, test, and refine the presentation … and ensure that your **narrative is clear, compelling, and memorable.**" | "Our talent lies in organizing, framing and presenting the client's **narrative in a way that is clear, compelling and memorable.**" |
| "**We play the greatest role supporting trial teams during the months leading up to the trial and during the trial itself.**" | "**Our greatest capabilities are demonstrated during the months leading up to trial** supporting clients as the present their arguments at pretrial hearings and in expert reports and briefs, **as well as during trial itself.**" |
| "**Our litigation consultants are attorneys** who comprehend the "big picture" behind the litigation and understand the importance of detail." | "**Our litigation consultants, former litigators themselves,** have an eye for intelligent and persuasive design." |

6.      As discussed below, Tishler and Yarnoff were contractually bound by several agreements not to disclose and to keep secret Animators' confidential and proprietary information. (Separate from these contracts, Defendants' conduct was illegal under a host of other theories.) Moreover, there is no question that Defendants knew that what they were doing was illegal. Tellingly, a document created by Tishler and Yarnoff in January 2010 and which was shared with CLS (identified below as Exhibit "14") is essentially an admission of

guilt because Tishler and Yarnoff acknowledge their conduct could raise "trade secret issues". Moreover, Tishler herself is an attorney. She was a former intellectual property litigator at Jones Day and is licensed to practice law in New York and the District of Columbia[2]. Separate from her contractual obligations, Tishler knew that her conduct breached every legal, fiduciary and ethical canon imaginable.

7.    Animators spent considerable time and money over the past fifteen years forging critical relationships with attorneys and law firms. Through hard work and persistence, Animators developed a well-deserved and hard-earned reputation as one of the country's leading litigation support companies. Taking full advantage of their intimate knowledge of Animators' confidential and proprietary information, Tishler and Yarnoff, with CLS' full cooperation and encouragement, have stolen Animators' business. Moreover, after their abrupt resignation, Defendants blatantly hacked into Animators' computer systems, viewing, copying, downloading, altering and/or deleting hundreds of confidential client files and proprietary information belonging to Animators. Ironically, Tishler's and Yarnoff's new employer, CLS, is an expert in computer systems and e-discovery requirements. Indeed, CLS is currently advertising for a "Trial Consultant" and one of the job requirements is "[p]ast litigation experience (preferably federal law)". CLS clearly knows of the severity and consequences of computer hacking, making CLS' potential participation and acquiescence in this conduct particularly egregious.

---

[2] "Person of Interest" Kathleen Iwasaki, whose role is described herein, is also an attorney licensed in the District of Columbia.

8.     Through their illegal conduct, Tishler and Yarnoff have gift-wrapped CLS a fully operational and highly profitable[3] new "litigation support division" at no cost to CLS but at a devastating price to Animators.   Based solely on the Defendants' illegal conduct, Animators has lost over $1 million worth of existing business and future business opportunities, and Animators' reputation has been in many instances severely, possibly irreparably damaged by the Defendants' illegal conduct.

## JURISDICTION AND VENUE

9.     Subject matter jurisdiction is proper under 28 U.S.C. §1331, as the Twelfth Claim for Relief arises under the Computer Fraud and Abuse Act, 18 U.S.C. §1030.  Subject matter jurisdiction is proper under the remaining claims pursuant to 28 U.S.C. §1367, as those claims are so related to the Twelfth Claim for Relief as to make them part of the same case or controversy.

10.    The United States District Court for the Eastern District of Virginia, Alexandria Division, is the proper venue pursuant to 28 U.S.C. §1391(a) because a substantial part of the acts and events giving rise to the claims asserted herein occurred in this District, and because all of the parties work and/or reside in this district.

## THE PARTIES

---

[3] CLS Trial Consulting certainly appears to be flourishing.  Just over a month ago, CLS announced the hiring of Andrew Schliesske as its "Senior Trial Technology Consultant" to lead CLS Trial Consulting's "in-court trial technician team".  *See* September 21, 2010 press release, "News" tab at www.capitallegals.com.  A few months earlier, announcing the addition of another employee, CLS' owner boasted of his company's growth: "Sean joins us at a time of unprecedented growth in CLS's history, said Dharmesh Shingala, President and CTO of Capital Legal Solutions. We have...significantly expanded our service offerings by launching CLS Trial Consulting".  *See* June 16, 2010 press release, "News" tab at www.capitallegals.com.  CLS is also currently advertising for a litigation attorney to join CLS Trial Consulting as a "Trial Consultant".  *See* "Careers" tab at www.capitallegals.com.

11.     Animators is organized under the laws of the State of Virginia, with its principal place of business at 814 King Street, Alexandria, Virginia.

12.     Defendant CLS is organized under the laws of the State of Virginia, with its principal place of business at 10521 Rosehaven Street, Fairfax, Virginia.

13.     Defendant Tishler is a citizen of Virginia, with her principal residence in Warrenton, Virginia.   Tishler joined Animators in 2006 and at the time of her defection to CLS in March 2010, held the title of Managing Director of Litigation Consulting.   Tishler is an attorney licensed to practice law in New York and the District of Columbia.   Before joining Animators, Tishler was a litigation attorney at Jones Day.

14.     Defendant Yarnoff is a citizen of Virginia, with his principal residence in Alexandria, Virginia.   Yarnoff joined Animators in 2008 and at the time of his defection to CLS in March 2010, held the title of National Sales Team Leader.   Before joining Animators, Yarnoff was in the software sales industry.

**PERSONS OF INTEREST**

15.     Dhramesh Shingala ("Shingala") is a citizen of Virginia, with his principal residence in Clifton, Virginia.   Shingala with his wife Gita Shingala founded CLS in 2002 and today they remain the sole owners of CLS.   Shingala is CLS' President and Chief Technology Officer.   Shingala holds an MS in Computer Science from Virginia Polytechnic Institute and State University and a BS in Production Engineering and Management from the National Institute of Technology in Calicut, India.   Shingala, on behalf of and for the considerable benefit of CLS, aided and abetted Tishler and Yarnoff in their theft of Animators' trade secrets and confidential and proprietary information.   For example, Shingala, on behalf of CLS, induced Tishler and Yarnoff to steal Animators' existing and potential clients and

business opportunities and offered them lucrative positions at CLS' new division, CLS Trial Consulting. Shingala also induced Tishler and Yarnoff to hire away from Animators other employees to help staff CLS' new litigation support division.

16.     Vyanjana Pandya ("Pandya") is a citizen of Maryland, with his principal residence in Gaithersburg, Maryland. Pandya has worked at CLS since April 2008 as an "AR Specialist". Pandya is a Certified Public Accountant and is a member of American Institute of Certified Public Accountants. Pandya was also or still is a member of the Institute of Company Secretaries of India and the Institute of Chartered Accountants of India.

17.     Bain Zietlow ("Zietlow") is a citizen of Virginia with his principal residence in Alexandria, Virginia. Zietlow worked for Animators from June 1, 1998 to March 9, 2010. He now works at CLS.

18.     Kathleen Iwasaki ("Iwasaki") is a citizen of Virginia, with her principal residence in Arlington, Virginia. Iwasaki worked for Animators from August 3, 2008 to March 9, 2010. Iwasaki is an attorney licensed to practice law in the District of Columbia. Before joining Animators, Iwasaki was an attorney practicing in the intellectual property department at Morgan & Finnegan. She now works at CLS.

19.     Pamela Frantz ("Frantz") is a citizen of Virginia, with her principal residence in Vienna, Virginia. Frantz worked for Animators from November 1, 2008 to March 9, 2010. She now works at CLS.

20.     Karine Beers ("Beers") is a citizen of France, with her principal residence in Alexandria, Virginia. Beers worked from Animators from June 28, 2004 to March 19, 2010. She now works at CLS.

21.     Shingala, Pandya, Zietlow, Iwasaki, Frantz and Beers are referred to herein as "Persons of Interest."  The actions and inactions of these Persons of Interest are attributed to CLS and CLS is fully responsible for them.  It is likely that these Persons of Interest are directly liable to Animators for the damages it has suffered and after appropriate discovery, Animators anticipates seeking leave to add one or more of these Persons of Interest as defendants in this action.

## RELEVANT FACTS

**A.**   **Animators' Confidential and Proprietary Information and Trade Secrets**

22.   Animators was founded in 1995 by its current President and Chief Executive Officer, Kenneth Lopez ("Lopez").   Animators is a leading attorney owned and operated provider of trial exhibits, trial graphics, demonstrative evidence, courtroom animation and trial technicians, providing these services to more than 90% of the world's top law firms.

23.   Animators takes the confidentiality of its confidential and proprietary information, including trade secrets, very seriously.   This information includes:

(a)   The law firms Animators gets business from, including how much business a particular firm has given Animators and how much future business is likely.   While the name of the firm itself may not necessarily be proprietary (although in some instances it is) Animators' history with that firm and the expectation or prediction of future business certainly is.   Through its work with the hypothetical "ABC Law Firm", for example, Animators may learn about that firm's future plans, clients it might land or solicit, actual business that will be coming in and other valuable proprietary business information, all of which gives Animators a competitive advantage.

(b)   The individual attorneys at law firms with whom Animators has relationships. These relationships are critical to Animators.   A particular attorney or trial team may have worked with Animators in the past and had a favorable experience and will thus be likely to use Animators' services again.   Through this relationship, Animators gains valuable insight into how that particular attorney or team works and their likes and dislikes.   Moreover, if a particular attorney moves to another law firm, that attorney may bring Animators on board for

a particular matter, thus giving Animators a "foot in the door" at that new firm through its relationship with a particular attorney.

(c)     Working on a specific matter gives Animators valuable insight into a particular client's likes and dislikes and also a window into that client's industry.  For example, if Animators hypothetically works on an "XYZ Technology Company" matter, Animators gains valuable insight into XYZ Technology Company's business and its industry.  If Animators does work for that company or in that industry again, Animators brings with it a valuable "learning curve" that would make it more effective and efficient and thus more competitive.

(d)     Projects Animators is working on and the details of those projects.  If Animators is engaged on a particular matter, the details of what Animators is doing and what future work may be likely on a particular assignment is very valuable and proprietary information.

(e)     Future projects "in the pipeline" is also valuable and proprietary information. Through its relationship with a particular firm or attorney, or having worked for a particular client or in a particular industry, Animators may learn of future work, giving it a competitive advantage in bidding for that work.

(f)     The way Animators prices its work is also proprietary and confidential information.  Through its work for a particular firm, attorney or client, Animators may learn valuable pricing information that will give it a competitive advantage for any future work.

(g)     Animators' relationships with third-party vendors is often confidential and proprietary.  For example, Animators may learn that a particular law firm or attorney prefers the "XYZ Vendor", so Animators may be inclined to use that vendor on future work for that

firm or attorney. Moreover, frequent retention of a particular vendor may allow Animators to negotiate a more favorable fee, all of which gives Animators a competitive advantage.

The information described in paragraph 23 (a)-(g) above is collectively referred to as "Confidential Information".

**B.** **Animators Secures and Avoids the Unauthorized Dissemination of its Confidential Information**

24.     Animators takes appropriate steps to ensure that its Confidential Information is secure and is not disseminated unnecessarily. For example:

(a)     Employees are required to acknowledge their obligation to secure and keep secret Animators' Confidential Information. This mandate is contained in a variety of Animators' documents, including:

(i)     Animators' "Team Manual", a true and correct copy of which is attached hereto was Exhibit "2";

(ii)     Animators' "Receipt & Acknowledgement of Animators at Law Team Manual & Confidentiality Agreement", a true and correct copy of which is attached hereto as Exhibit "3";

(iii)     Animators' "Confidentiality, Non-Solicitation and Non-Competition Agreement", a true and correct copy of which is attached hereto as Exhibit "4"; and

(iv)     Animators' "Confidentiality and Non-Solicitation Agreement", a true and correct copy of which is attached hereto as Exhibit "5";

Regardless of the document, the language of Animators' confidentiality mandate is essentially as follows:

---

COMPLAINT AND DEMAND FOR JURY TRIAL

"I understand that Animators at Law, Inc., has developed and used and will be developing and using Confidential Information in connection with its business. 'Confidential Information' includes, but is not limited to, client identities, vendor identities, information relating to the development of interactive multimedia products such as product development and distribution plans, sources of content, licensing and royalty arrangements, profits, sales, pricing policies, operational methods, technical processes and other business affairs and methods, plans for future developments and other information which is not readily available to the public. This information was developed and will be developed by Animators at Law at great expense and constitutes trade secrets of Animators at Law. To safeguard this Confidential Information, Animators at Law has instituted policies and procedures to protect such information.

In connection with my employment by Animators at Law, I will come into contact with such Confidential Information. I understand that the Confidential Information is vital to the success of Animators at Law's business and, in consideration of my employment by Animators at Law, I agree to the following three points:

1.      I agree that during and after my term of engagement with Animators at Law:

(a)      I shall keep secret all Confidential Information and not reveal or disclose it to anyone outside of Animators at Law, except with Animators at Law's prior written consent; and

(b)   I shall not make use of any of such Confidential Information for my own purposes or for the benefit of anyone other than Animators at Law; and

(c)   I shall deliver promptly to Animators at Law, upon the termination of my engagement and at any time Animators at Law may so request, all software, data, memoranda, notes, video, records and other documents (and all copies thereof) constituting or relating to such Confidential Information which I may then possess.

*See, e.g.,* Ex. "2", pp. 3-4, Ex. "3", pp. 1-2 and Ex. "4" at ¶¶1 and 2.

(b)   Animators maintains secure office environments protected by security systems, with 24/7 monitoring and individually assigned pass codes. Employees are told that these pass codes are assigned to individuals and are not "transferrable".

(c)   Animators maintains a secure computing environment by requiring password protected sign-in to the company's file server, email systems, phone systems, online electronic storage areas and individual workstations. Again, employees are told these passwords are unique and are not transferrable.

**C.   Animators is Required to Keep Client Information Confidential**

25.   In Animators' business, it is given and has access to, highly confidential information from its clients. For example, Animators is privy to information protected by the attorney-client privilege, attorney work product and many other privileges. Additionally, information exchanged by parties to litigation, and that Animators may have access to, is often governed by a Protective Order limiting its dissemination. This information is collectively referred to as "Client Information".

26.    Sometimes a law firm's engagement agreement with Animators requires that Animators keep Client Information confidential. Sometimes, Animators is required to sign Protective Orders entered by courts in ongoing litigation where Animators has been retained. These Protective Orders are required to be signed by individual Animators employees who might be given access to Client Information while working on a particular assignment. Tishler, Yarnoff and some of the Persons of Interest signed such Protective Orders while working for Animators.

**D.    Tishler Joins Animators in 2006**

27.    Tishler joined Animators on or about January 3, 2006. Tishler had previously worked at Jones Day as a litigation attorney in that firm's intellectual property department. At the time she joined Animators, Tishler was and still is licensed to practice law in New York. After joining Animators, Tishler obtained her license to practice law in the District of Columbia where she is still so licensed.

28.    When she was first hired, Tishler's title was Litigation Consultant. She was given an annual salary of $125,000 plus additional benefits and a potential annual bonus of $25,000.

29.    Tishler signed agreements concerning Animators' Confidential Information and understood and acknowledged her obligation to keep this information confidential and secure. For example, Tishler signed an offer letter dated November 23, 2005, a true and correct copy of which is attached hereto as Exhibit "6". In that letter, Tishler acknowledged that she would "thoroughly" read Animators' "Team Manual" (Ex. "2") and would sign and return copies of Animators' "Receipt and Acknowledgement of Animators at Law Team Manual" (Ex. "3") and Animators' "Non-Compete Agreement" (Ex. "4"). Additionally,

Tishler is an attorney licensed to practice law in New York and the District of Columbia. She had worked for several years as a litigator at Jones Day. With her education, training and experience, Tishler clearly knew of her contractual, legal, ethical and fiduciary obligations not to disclose or misappropriate Animators' Confidential Information and Client Information.

30.     As part of her duties at Animators, Tishler was also required to sign Protective Orders. These orders typically identified with specificity what information was covered by the order and what a signatory to the order was permitted to do and prohibited from doing. These Protective Orders also invariably had language where the signatory acknowledged the consequences of violating the Order. Language such as "I understand that violation of the Protective Order may be punishable by issuance of an injunction, [or] contempt...." was typical. Moreover, even if Tishler did not sign a particular Protective Order, she and all of Animators' employees who were working on a project where a Protective Order had been entered, knew of their obligation to keep certain information confidential.

31.     As a Litigation Consultant, Tishler reported directly to Animators' President and Chief Executive Officer, Lopez. Her duties included acting as a liaison between Animators' clients who are typically litigators and the Animators' design team.

32.     Later in 2006, Tishler was promoted to the position of Senior Litigation Consultant. Her salary was increased to $150,000 per year. Her job duties in this position included management of other litigation consultants on her team and participating in the strategic, tactical and financial management of Animators. Her title was later changed to Managing Director, Litigation Consulting. Tishler held this position and these duties at the time she resigned from Animators on or about March 9, 2010.

E.     **Yarnoff Joins Animators in 2008**

33.     Yarnoff joined Animators on or about October 16, 2008.

34.     When he was hired, Yarnoff's title was National Sales Team Leader.  He was given an annual base salary of $85,000 and additional benefits. Yarnoff also realistically stood to earn commissions of approximately $215,000 annually.

35.     Yarnoff signed agreements concerning Animators' Confidential Information and understood and acknowledged his obligation to keep this information confidential and secure.  For example:

(a)     Yarnoff signed an offer letter dated October 1, 2008, a true and correct copy of which is attached hereto as Exhibit "7".  In that letter, Yarnoff acknowledged that he would "thoroughly" read Animators' "Team Manual" (Ex. "2") and would sign and return copies of Animators' "Receipt and Acknowledgement of Animators at Law Team Manual" Ex. "3");

(b)     Yarnoff signed Animators' "Receipt & Acknowledgement of Animators at Law Team Manual and Confidentiality Agreement", a true and correct copy of which is attached hereto as Exhibit "8".

(c)     Yarnoff was also required to sign Animators' Confidentiality, Non-Solicitation and Non-Competition Agreement (Ex. "4").

36.     As part of his duties at Animators, Yarnoff was also required to sign Protective Orders.  These orders typically identified with specificity what information was covered by the order and what a signatory to the order was permitted to do and prohibited from doing. These Protective Orders also invariably had language where the signatory acknowledged the consequences of violating the Order.  Language such as "I understand that violation of the Protective Order may be punishable by issuance of an injunction, [or] contempt...." was

typical.  Moreover, even if Yarnoff did not sign a particular Protective Order, he and all of Animators' employees who were working on a project where a Protective Order had been entered, knew of their obligation to keep certain information confidential.

37.    As National Sales Team Leader, Yarnoff reported to Animators' President and Chief Executive Officer, Lopez.  His duties included developing and executing a sales strategy for the company.   Yarnoff participated in the management of Animators, strategically, tactically and financially.  Yarnoff held this title and these duties at the time he resigned from Animators on March 9, 2010.

**F.    Certain Persons of Interest Signed Agreements Regarding Confidential Information and Client Information**

38.    Certain Persons of Interest also signed documents acknowledging and agreeing to abide by Animators' confidentiality requirements.  For example:

(a)    Person of Interest Zietlow signed Animators' "Receipt and Acknowledgement of Animators at Law Team Manual and Confidentiality Agreement", a true and correct copy of which is attached hereto as Exhibit "3";

(b)    Person of Interest Iwasaki signed Animators' "Confidentiality & Non-Solicitation Agreement", a true and correct copy of which is attached hereto as Exhibit "5";

(c)    Person of Interest Beers signed Animators' "Acknowledgement and Agreement", a true and correct copy of which is attached hereto as Exhibit "9".  In this document, Beers agreed "not to use, retain or divulge any confidential information of [Animators] or it affiliates, employees or customers".

## G.    **Animators Occasionally Hires CLS as a Vendor**

39.    Until its misappropriation of Animators' Confidential Information and Client Information as described herein, Animators and CLS were not competitors. Animators would occasionally use CLS as a vendor on projects where Animators had the primary contract. For example, Animators engaged CLS as a vendor in "Project A"[4] on behalf of Animators' client, "Law Firm 1". When the client asked Animators to provide e-discovery services on that matter, Animators offered to bring in a vendor to provide these services. The law firm recommended CLS, noting that it had a favorable experience with them on a prior matter. Animators then brought in CLS as a vendor on this project.

## H.    **Tishler, Yarnoff and CLS Devise a Plan to Steal Animators' Confidential Information Under the Guise of a "Buyout"**

40.    In early February 2010, Tishler, Yarnoff and Person of Interest Zietlow approached Lopez with a "proposal" to buy Lopez' interest in Animators. Lopez agreed to entertain this offer. At no time then or thereafter did Tishler and Yarnoff disclose any details of their plan to Lopez. For example, they never told Lopez how any buyout would be funded or the identity of any potential buyer. They certainly never told Lopez that for over a month before they approached him, Tishler and Yarnoff had been secretly talking with CLS about Animators' business.

---

[4] In this Complaint, Animators has not disclosed the names of its clients or former clients (typically law firms) or the names of projects it was engaged to work on (typically litigation) because (1) this information may not be public knowledge; and (2) this information, despite Defendants' conduct, still constitutes Animators' confidential and proprietary information and may constitute trade secrets. Animators therefore refers to the law firms and projects by pseudonyms ("Law Firm 1", Project "A", *etc.*) Animators has also redacted the names of the law firms and projects (and other confidential information) from exhibits attached to this Complaint. If necessary, Animators will produce this information upon entry of an appropriate Protective Order.

41.   Tishler and Yarnoff told Lopez they needed access to Animators' financial information as part of their due diligence.   Although Tishler and Yarnoff were already contractually and legally bound not to disclose Animators' Confidential Information, Animators required them and Person of Interest Zietlow to sign a "Confidential Disclosure Agreement".   True and correct copies of the agreements signed by Tishler, Yarnoff and Zietlow are attached hereto as Exhibits "10", "11" and "12" respectively.   In this agreement, Tishler, Yarnoff and Zietlow agreed among other things not to disclose Animators' Confidential Information to clients, vendors or employees of Animators. (*See, e.g.,* Ex. "10", ¶3).

42.   It is now clear that well before they approached Lopez with their "proposal", Tishler and Yarnoff were very likely working in secret with CLS to gain access all of Animators' Confidential Information under the pretense of a buyout proposal.   This would have been a direct violation of the Confidential Disclosure Agreement.

43.   For example, Tishler and Yarnoff prepared a document titled "Timeline Version 1, 1/14/10".   In it, Tishler and Yarnoff mention: "Dharmesh to talk to landlord on Fairfax lease"; Present budgets to Dharmesh"; "Present timeline to Dharmesh"; and "Present pros / cons list to Dharmesh".   "Dharmesh" refers to Person of Interest Dharmesh Shingala, the owner of CLS.   A true and correct copy of this document is attached hereto as Exhibit "13".

44.   Another document prepared by Tishler and Yarnoff on or about January 14, 2010 is titled "Benefits / Drawbacks to Maintaining Animators at Law Brand, Version 1, 1/14/10".   This document mentions "complexity of ownership transfer to CLS" and "delay in

presenting to the market a larger, integrated services / solution provider under the CLS name". A true and correct copy of this document is attached hereto as Exhibit "14".

45.    Animators cannot at this stage pinpoint the exact date that Tishler, Yarnoff and CLS concluded that they wanted Animators' business and clients but did not want to pay for them.   It is likely that they collectively formed that intent before Tishler and Yarnoff approached Lopez with their "proposal" in early February 2010.  What is clear is that shortly after then, at the latest, Tishler, Yarnoff and CLS had decided to steal Animators' business. For example, in a document prepared by Tishler and Yarnoff in February 2010, they note: "How do we characterize/announce our relationship to CLS (since they aren't purchasing [Animators])"?    (Emphasis added). A true and correct copy of this document is attached hereto as Exhibit "15".

46.    If CLS was ever a legitimate "merger partner", by February 2010 at the latest that had changed.  However, Tishler and Yarnoff never advised Lopez that their undisclosed merger partner (CLS) was no longer interested in buying Animators (if indeed they ever were which is doubtful).  Why would they?  For one thing, talking to CLS was a direct violation of the Confidential Disclosure Agreement (Exs. "10", "11" and "12")..  Moreover, the buyout proposal was a convenient subterfuge to allow Tishler, Yarnoff and CLS access to all of Animators' Confidential Information.  Tishler and Yarnoff already had access to Animators' non-financial confidential information, but maintaining the buyout ploy allowed them access to everything.  Moreover, this ruse gave them "cover" in case, for example, they were questioned about why they were gathering all of this proprietary information at one time. Thus, Tishler, Yarnoff and CLS had every incentive to keep up the pretense that they were looking for a legitimate buyer for Animators, when in fact the opposite was true.

I.    **Tishler, Yarnoff and Certain Persons of Interest Resign En Masse From
      Animators and With No Advance Notice on March 9, 2010**

47.    On or about March 9, 2010, Tishler, Yarnoff, and Persons of Interest Zeitlow,
Iwasaki and Frantz resigned from Animators.  Person of Interest Beers resigned on or about
March 19, 2010.  All of them immediately joined CLS.  They gave no advance notice and
they left immediately.  Until the moment of their resignation, Lopez still believed that Tishler
and Yarnoff were pursuing their buyout proposal.  He had no idea that proposal had been
secretly abandoned possibly months earlier (assuming it was ever a legitimate proposal to
begin with).  Lopez had no idea until the moment of their resignation that these employees
were going to resign.  Moreover, all of them tendered their resignations "effective
immediately" in the middle of client projects they were leading with hundreds of billions of
client dollars at stake and multiple imminent trials.

J.    **Tishler and Yarnoff Had Secretly Been Stealing Animators' Confidential
      Information Months Before Their Resignation**

48.    Immediately after their defection to CLS, Animators took steps to secure its
Confidential Information and assess any damage Tishler and Yarnoff had caused.  In that
regard, Animators hired a third party expert to forensically examine Animators' computers.
The results were devastating:

(a)    On or about January 12, 2010, possibly earlier, Tishler and Yarnoff started
planning for the mass departure of themselves and Persons of Interest Zietlow, Iwasaki,
Frantz and Beers.  Documents recovered from Tishler's company computers show that
budgeting documents were created for an entity called "NewCo Litigation Consultants."  A
true and correct copy of this document is attached hereto as Exhibit "16".

(b)    On or about February 10, 2010, Tishler and Yarnoff prepared a document titled "Capital Legal Solutions and Animators at Law – A Strategic Relationship and Merger". This document outlines a plan to "launch a full-service technology and litigation support company under the Capital Legal Solutions (CLS) name in 2010". In this document, Tishler and Yarnoff project annual revenue from new business of $2 million - $5 million. This document also offers options for how to launch the new firm:

"2.    With colleagues at Animators, we start a new litigation support company, funded in part by CLS, with shared ownership interests."

or

"3.    We bring an elite team of professionals who offer litigation consulting and support services into CLS to create this type of litigation support capability in-house at CLS, with an equity stake in the overall entity".

A true and correct copy of this document is attached hereto as Exhibit "17".

(c)    On or about March 1, 2010, (eight days prior to their abrupt resignation) Tishler and Yarnoff prepared a document entitled "AAL Sales and Revenue Forecast", a true and correct copy of which is attached hereto as Exhibit "18". In this document, which was shared with CLS, Tishler and Yarnoff outline all Animators' existing projects and projects "in the pipeline" and predict revenue of over $4.3 million.

(d)    On or about March 3, 2010, (six days prior to their abrupt resignation) Tishler and Yarnoff prepared and sent pro forma financial statements very likely incorporating Animators' Confidential Information to Person of Interest Pandya and possibly others at CLS. Tishler and Yarnoff also met with Pandya that day.

---

COMPLAINT AND DEMAND FOR JURY TRIAL

(e)    On or about March 5, 2010, (four days prior to their abrupt resignation) Tishler and Yarnoff exchanged drafts of a document entitled "Proposed Compensation for the CLS Arts Team". In relevant part, this document reads: "[a]s outlined in the previously submitted financial pro formas for the new CLS business division, currently named CLS Arts, we have identified the initial personnel who will have a place when we launch this division this month...." A true and correct copy of this document is attached hereto as Exhibit "19".

(f)    On or about March 8, 2010, (the day before their abrupt resignation) Tishler and Yarnoff prepared a document "CLS Arts Client Transition". This document identified eleven existing Animators' projects and a strategy to steal the work and bring it to CLS. For example:

- In "Project 2", Tishler and Yarnoff recommended that to induce future business from "Law Firm B", they should "**[c]omplete the work necessary to prepare the team for trial *gratis*, as a way to convert the client over to CLS Arts using our good will**". (Emphasis added).

- The document identified other litigation where Animators had been engaged and how much future revenue was likely. For example

  o  In "Project 3", Tishler and Yarnoff predicted additional revenue of between $50,000-75,000 from "Law Firm C".

  o  In "Project 4", they predicted additional revenue of between $50,000-75,000 from "Law Firm D".

  o  In "Project 5", they predicted $50,000-75,000 in future revenue from "Law Firm E".

      o  In "Project 6", they predicted $10,000-15,000 in future revenue from "Law Firm F".

A true and correct copy of this document is attached hereto as Exhibit "20".

(g)     In a document dated March 8, 2010 entitled "Client Transition", Tishler and Yarnoff identified, in addition to eleven ongoing projects, ten projects "in the pipeline" that were additional conversion targets.  This document predicted additional revenue of $875,000 from all twenty one projects.   A true and correct copy of this document is attached hereto as Exhibit "21".

(h)     Tishler and Yarnoff sent these documents to, among others, Person of Interest Shingala at CLS on or about March 8, 2010.  Emails between Shingala and Tishler/Yarnoff at around this time commented: "Wonderful window of [opportunity]".

(i)     Also on or about March 8, 2010, and likely before then, Tishler and Yarnoff were copying hundreds of files onto external hard drives, including Confidential Information and possibly Client Information subject to Protective Orders in ongoing litigation.

K.     **Tishler and Yarnoff and Some Persons of Interest Accessed Animators'**
       **Computers Without Authorization After Their Resignation**

49.     In addition to stealing Animators' Confidential Information and Client Information while employed by Animators, Tishler and Yarnoff and at least some of the Persons of Interest accessed Animators' computer systems without authorization after their resignation.  For example:

(a)     **Drop Box Account**.   This account was used by Animators to store Confidential Information and Client Information and allowed certain Animators employees and clients to access this information remotely.  Files in the Drop Box account were also

---

"linked" to Animators' computer hard drives.  For example, Tishler may create a file for the "XYZ Project" in the Drop Box account.  Documents created by Animators for this project could then be "dropped" into the XYZ Project file.  Those documents could be accessed remotely by certain Animators employees who were given access (*i.e.*, a password) and also by the client (again, with a password).  If there was "activity" in the XYZ Project file in the Drop Box account, (*e.g.*, if a document was added to the file or viewed) that activity would be noted on Animators' computer hard drives at its offices.  Only certain Animators employees were authorized to access these files, and no employee was allowed access after their resignation. Despite this, Tishler, Yarnoff and Persons of Interest Zietlow, Frantz and Iwasaki accessed and viewed, copied, altered and/or downloaded Animators' Confidential Information and Client Information located on Animators' "Drop Box" account on at least the following dates post-resignation:  March 11, March 12, March 24, March 25, March 26, April 1 and April 2, 2010.  This was done without authorization and on behalf of and with the knowledge of CLS.

        (b)     **Animators' Time Records**.  Animators used "Get My Time", a web-based system for tracking employees' time.  Only those people with a password can enter the system to view, add, delete or change time records.  After they resigned from Animators, Tishler and Yarnoff, without authorization and on behalf of CLS and with CLS' knowledge, accessed this system and viewed, added, downloaded, altered and/or deleted their Animators' time records and the time records of others, including some of the Persons of Interest.  For example, on April 1, 2010, Tishler accessed Animators' time system and downloaded time records onto an Excel spreadsheet using CLS' computers.  This was done without authorization and on behalf of and with the knowledge of CLS

---

(c)    **Animators' Computers.**   Many Animators' employees, including Tishler, Yarnoff and certain Persons of Interest, used laptop computers provided to them by Animators.  After they resigned on March 9, 2010, Tishler and Person of Interest Zietlow failed to immediately return an Animators' Toshiba laptop computer.  It was finally returned by Tishler on March 19, 2010.  A forensic analysis of this computer shows that the day before it was returned, Tishler and Person of Interest Zietlow, without authorization and on behalf of and with the knowledge of CLS, viewed, copied, altered, downloaded and/or deleted almost one thousand (1,000) files on this computer containing Animators' Confidential Information and Client Information.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract [Confidentiality Agreement] against Tishler)

50.    Animators realleges paragraphs 1 through 49 as though set forth herein.

51.    As a condition of her employment with Animators, Tishler agreed to be bound by Animators' confidentiality agreement, as contained in at least the following documents: Tishler's offer letter (Ex. "6"), "Team Manual" (Ex. "2"), "Receipt and Acknowledgement of Animators at Law Team Manual (Ex. "3") and Animators' "Non-Compete Agreement" (Ex. "4") (collectively, the "Confidentiality Agreement").

52.    At all relevant times, Animators performed its duties with respect to the Confidentiality Agreement except those duties excused by Tishler's conduct.

53.    Tishler has breached and continues to breach her obligations to maintain the confidentiality of Animators' Confidential Information and Client Information under the Confidentiality Agreement.

54.     As a proximate result of the wrongful conduct of Tishler, Animators has suffered and continues to suffer substantial damages.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract [Confidential Disclosure Agreement] against Tishler)

55.     Animators realleges paragraphs 1 through 54 as though set forth herein.

56.     Tishler agreed to be bound by the terms of the Confidential Disclosure Agreement ("NDA Agreement") (Ex. "12").

57.     At all relevant times, Animators performed its duties with respect to the NDA Agreement except those duties excused by Tishler's conduct.

58.     Tishler has breached and continues to breach her obligations to maintain the confidentiality of Animator's Confidential Information and Client Information under the NDA Agreement.

59.     As a proximate result of the wrongful conduct of Tishler, Animators has suffered and continues to suffer substantial damages.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract [Confidentiality Agreement] against Yarnoff)

60.     Animators realleges paragraphs 1 through 59 as though set forth herein.

61.     As a condition of his employment with Animators, Yarnoff agreed to be bound by Animators' confidentiality agreement, as contained in at least the following documents: Yarnoff's offer letter (Ex. "7"), "Team Manual" (Ex. "2"), "Receipt and Acknowledgement of Animators at Law Team Manual (Ex. "3") and Animators' "Non-Compete Agreement" (Ex. "4") (collectively, the "Confidentiality Agreement").

62.    At all relevant times, Animators performed its duties with respect to the Confidentiality Agreement except those duties excused by Yarnoff's conduct.

63.    Yarnoff has breached and continues to breach his obligations to maintain the confidentiality of Animator's Confidential Information and Client Information under the Confidentiality Agreement.

64.    As a proximate result of the wrongful conduct of Yarnoff, Animators has suffered and continues to suffer substantial damages.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract [Confidential Disclosure Agreement] against Yarnoff)

65.    Animators realleges paragraphs 1 through 64 as though set forth herein.

66.    Yarnoff agreed to be bound by the terms of the Confidential Disclosure Agreement ( "NDA Agreement") (Ex. "13").

67.    At all relevant times, Animators performed its duties with respect to the NDA Agreement except those duties excused by Yarnoff's conduct.

68.    Yarnoff has breached and continues to breach his obligations to maintain the confidentiality of Animator's Confidential Information and Client Information under the NDA Agreement.

69.    As a proximate result of the wrongful conduct of Yarnoff, Animators has suffered and continues to suffer substantial damages.

## FIFTH CLAIM FOR RELIEF

### (Tortious Interference With Contractual Relations Against CLS)

70.    Animators realleges paragraphs 1 through 69 as though set forth herein.

71.     CLS knew of Tishler's and Yarnoff's contractual obligations to Animators under the Confidentiality Agreement and the NDA Agreement.  CLS knew that both Tishler and Yarnoff had agreements with Animators requiring them to protect the confidentiality of Animator's confidential and proprietary information and trade secrets, and client information.

72.     By its wrongful actions, CLS intentionally induced Tishler and Yarnoff to breach their contracts with Animators and tortiously interfered with Animator's contractual relations with Tishler and Yarnoff.

73.     As a proximate result of CLS' wrongful conduct, Animators has suffered and continues to suffer substantial damages.

74.     CLS' conduct is outrageous, intentional and exhibits a high degree of moral culpability.

75.     CLS continues to use Animators' Confidential Information and Client Information and its conduct warrants an award of substantial punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets Against All Defendants)

76.     Animators realleges paragraphs 1 through 75 as though set forth herein.

77.     Defendants have knowingly misappropriated and used Animators' trade secrets in breach of their agreements, confidential relationships and fiduciary duties to Animators.

78.     By their wrongful actions, including discovery of Animators' trade secrets through improper means, Defendants have knowingly misappropriated and used, or aided and abetted the misappropriation and misuse of Animators' trade secrets.

79.     As a proximate result of Defendants' wrongful conduct, Animators has suffered and continues to suffer substantial damages.

COMPLAINT AND DEMAND FOR JURY TRIAL

80.     Defendants' conduct is outrageous, intentional and exhibits a high degree of moral culpability.

81.     Defendants continue to use Animators' Confidential Information and trade secrets and Client Information and their conduct warrants an award of substantial punitive damages.

## SEVENTH CLAIM FOR RELIEF

### (Unfair Competition Against All Defendants)

82.     Animators realleges paragraphs 1 through 81 as though set forth herein.

83.     By their wrongful actions, Defendants have knowingly misappropriated confidential and proprietary information for use in CLS' business and have engaged in unfair competition with Animators.

84.     As a proximate result of Defendants' wrongful conduct, Animators has suffered and continues to suffer substantial damages.

85.     Defendants' conduct is outrageous, intentional and exhibits a high degree of moral culpability.

86.     Defendants continue to use Animators' Confidential Information and Client Information and their conduct warrants an award of substantial punitive damages.

## EIGHTH CLAIM FOR RELIEF

### (Theft/Conversion Against All Defendants)

87.     Animators realleges paragraphs 1 through 86 as though set forth herein.

88.     By their wrongful actions, Defendants have intentionally stolen and converted Animators' Confidential Information and trade secrets and Client Information.

89.    As a proximate result of Defendants' wrongful conduct, Animators has suffered and continues to suffer substantial damages.

90.    Defendants' conduct is outrageous, intentional and exhibits a high degree of moral culpability.

91.    Defendants continue to use Animators' Confidential Information and Client Information and their conduct warrants an award of substantial punitive damages.

## NINTH CLAIM FOR RELIEF

### (Breaches of Fiduciary Duty Against Tishler and Yarnoff)

92.    Animators realleges paragraphs 1 through 91 as though set forth herein.

93.    As senior employees entrusted with confidential and proprietary information and trade secrets, Tishler and Yarnoff owed fiduciary duties to Animators.

94.    Tishler and Yarnoff breached those duties by stealing Animators' Confidential Information and Client Information and by making improper use of that information and those secrets for purposes contrary to Animators' interests.

95.    As a proximate result of Tishler's and Yarnoff's wrongful conduct, Animators has suffered and continues to suffer substantial damages.

96.    Defendants' conduct is outrageous, intentional and exhibits a high degree of moral culpability.

97.    Defendants continue to use Animators' confidential and proprietary information and their conduct warrants an award of substantial punitive damages.

## TENTH CLAIM FOR RELIEF

### (Aiding and Abetting Breaches of Fiduciary Duty Against CLS)

98.    Animators realleges paragraphs 1 through 97 as though set forth herein.

---

COMPLAINT AND DEMAND FOR JURY TRIAL

99. CLS knew of the fiduciary duties that Tishler and Yarnoff owed to Animators. CLS knowingly induced and participated in Tishler's and Yarnoff's breaches of their fiduciary duties.

100. As a proximate result of CLS' wrongful conduct, Animators has suffered and continues to suffer substantial damages.

101. CLS' conduct is outrageous, intentional and exhibits a high degree of moral culpability.

102. CLS continues to use Animators' Confidential Information and Client Information and its conduct warrants an award of substantial punitive damages.

## ELEVENTH CLAIM FOR RELIEF

### (Unjust Enrichment Against All Defendants)

103. Animators realleges paragraphs 1 through 102 as though set forth herein.

104. By their wrongful actions, Defendants have been unjustly enriched at Animators' expense. It would be inequitable to permit Defendants to retain the fruits of their wrongful and unlawful conduct.

105. As a proximate result of Defendants' wrongful conduct, Animators has suffered and continues to suffer substantial damages.

## TWELFTH CLAIM FOR RELIEF

### (Violation of the Computer Fraud and Abuse Act Against All Defendants)

106. Animators realleges paragraphs 1 through 105 as though set forth herein.

107. Animators' computers and related systems are "protected computers" under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2).

108.   Defendants intentionally accessed Animators' protected computer systems without authorization and/or in excess of their authorized access, thereby obtaining information from Animators' protected computer systems.

109.   Defendants knowingly and with intent to defraud accessed Animators' protected computer systems without authorization and/or in excess of their authorized access.

110.   Defendants furthered the intended fraud, obtained unauthorized use of Animators' protected computer system and obtained Animators' confidential and proprietary information and trade secrets, the value of which exceeds $5,000 in any one-year period.

111.   The wrongful conduct of Tishler and Yarnoff was done with the knowledge and participation of CLS for the benefit of CLS, such that CLS is equally responsible for the wrongful conduct of Tishler and Yarnoff.

112.   By their wrongful actions, Defendants intentionally accessed Animators' protected computer systems without authorization and as a result of such conduct caused Animators damage.

113.   Defendants' wrongful actions have caused loss to Animators exceeding $5,000 during any one-year period, as Animators has spent in excess of $5,000 responding to the offense and conducting a damage assessment.

114.   The activity of Defendants amounts to a violation of the Computer Fraud and Abuse Act, 18 U.S.C.A. §1030(a)(2)C), (a)(4), (a)(5)C) and Animators is entitled to damages under the Act.

## PRAYER FOR RELIEF

**WHEREFORE,** Animators at Law, Inc. prays for the following relief:

(i)      Preliminarily and permanently enjoining Defendants and their officers, agents, servants, employees and attorneys, and all other persons who are in active concert with them from using or benefiting, directly or indirectly, from the use of Animators' confidential, proprietary and trade secret information;

(ii)     Preliminarily and permanently enjoining Defendants and their officers, agents, servants, employees and attorneys, and all other persons who are in active concert with them, to immediately return all of Animators' confidential, proprietary and trade secret information in their possession, custody or control, wherever located, including any computers;

(iii)    Preliminarily and permanently enjoining Defendants and their officers, agents, servants, employees and attorneys, and all other persons who are in active concert with them, to immediately destroy and to certify under oath the destruction of all materials derived in any way directly or indirectly in whole or in part from Animators' confidential, proprietary and trade secret information;

(iv)    Preliminarily and permanently enjoining Defendants and their officers, agents, servants, employees and attorneys, and all other persons who are in active concert with them, to provide a detailed accounting of and impose a constructive trust on all revenues derived and expenses saved by Defendants from the use of Animators' confidential, proprietary and trade secret information;

(v)     Ordering Defendants to disgorge all unjust enrichment as a result of their use of Animators' confidential, proprietary and trade secret information;

COMPLAINT AND DEMAND FOR JURY TRIAL

(vi)   Ordering Defendants jointly and severally to pay Animators compensatory damages in an amount according to proof at trial;

(vii)   Ordering Defendants each to pay Animators punitive damages; and

(viii)   Ordering such other relief as this Court deems proper.

Dated: November 24, 2010

Respectfully submitted,

Kwamena Acquaah
Kathy Bailey (pending admission *pro hac vice*)
David Smith (pending admission *pro hac vice*)
BAILEY|GARY
1615 L Street, NW
Suite 650
Washington, DC 20036
(202) 887-8040; (202) 887-8044 (fax)
kacquaah@baileygary.com
VSB No. 30888
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury in this action.

Dated: November 24, 2010

Respectfully submitted,

Kwamena Acquaah
Kathy Bailey (pending admission *pro hac vice*)
David Smith (pending admission *pro hac vice*)
BAILEY|GARY
1615 L Street, NW
Suite 650
Washington, DC 20036
(202) 887-8040; (202) 887-8044 (fax)
kacquaah@baileygary.com
VSB No. 30888
Attorneys for Plaintiff